USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 6/26/13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X

In re CARBO CERAMICS, INC. STOCK        12 Civ. 1034 (LLS)
AND OPTIONS SECURITIES LITIGATION
                                        OPINION AND ORDER
------------------------------------X

This Document Relates to:

    ALL ACTIONS

------------------------------------X

In this consolidated securities class action, plaintiffs, investors in common stock and options contracts of Carbo Ceramics, Inc. ("Carbo") who purchased or sold those securities between October 27, 2011 and January 26, 2012, assert claims against defendants Carbo, Gary Kolstad, and Ernesto Bautista for violations of section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and rule 10b-5 thereunder, and against individual defendants under section 20(a) of the Exchange Act as "control persons" of Carbo.

The elements of a claim under section 10(b) and rule 10b-5 are that the defendants "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate

1

cause of their injury." Lentell v. Merrill Lynch & Co., 396 F.3d 161, 172 (2d Cir. 2005) (internal quotation marks omitted).

Plaintiffs allege that defendants made materially misleading statements about the impact on Carbo of a shift in the hydraulic fracking industry's focus from the extraction of natural gas to liquid oil.

Defendants move under Fed. R. Civ. P. 12(b)(6), 9(b), and the Private Securities Litigation Reform Act ("PSLRA") of 1995, 15 U.S.C. § 78u-4(b)(3)(A) (2006), to dismiss the amended consolidated complaint.

## The Complaint's Allegations

### Carbo's Logistical Problems

Carbo is a manufacturer and supplier of ceramic proppant, a product used in hydraulic fracking.[1] Gary Kolstad is Carbo's chief executive officer, and Ernesto Bautista is Carbo's chief financial officer.

Carbo has six production plants located in the United States and abroad, and transports proppant by rail to distribution facilities it maintains across North America.

---

[1] Hydraulic fracking is a process in which highly-pressurized fluids are pumped into natural gas or oil wells, which creates fractures in those formations that allow for the recovery of gas or oil. Proppants are particles added to the fluids pumped into the wells, that are utilized to prop open the fractures and allow the gas or oil to flow out freely.

Proppant is then distributed by truck to customer well sites from such facilities. Carbo is paid after delivery to customer well sites.

For several years before 2011, heightened demand for natural gas led to increased drilling for natural gas, and the resulting demand for proppant in areas with a propensity to produce natural gas. By early to mid-2011, the market had shifted, and natural gas prices fell far below oil prices. Consequently, many exploration and production companies shifted their focus to areas with a greater propensity for liquid oil production ("liquid-rich plays"). Carbo's proppant sales declined in natural gas fields, and there was a corresponding increase in demand for proppant in liquid-rich plays.

Areas that produce natural gas and liquid oil are located in different parts of the United States; in order to take advantage of the demand for its product in liquid-rich plays, Carbo needed to reconfigure its distribution structure to transport and distribute its proppant to liquid-rich areas.

Carbo experienced a number of logistical problems in distributing proppant to those liquid-rich areas. First, there was a shortage of railroad cars, and Carbo's railcar fleet was inadequate to transport sufficient proppant to liquid-rich areas. Second, Carbo lacked adequate storage capacity in

liquid-rich areas, and resorted to using railcars for storage, which further reduced the availability of its railcar fleet. Third, because the rail infrastructure was less developed in liquid-rich areas, the industry's migration to those areas caused significant railway congestion and service failures.

As a result of those issues, Carbo was unable to transport sufficient proppant to liquid-rich areas to fully realize the demand for its product, and its sales declined.

### The Alleged Fraud

On October 27, 2011, the beginning of the class period, Carbo issued a press release announcing its financial results for the previous quarter. Mr. Kolstad commented, in writing, on that announcement, stating:

> We are pleased that CARBO set a number of financial and operational records during the quarter. The exceptional third quarter results continued to highlight the importance that our clients place on high conductivity proppant, especially in the North American liquid-rich resource plays such as the Bakken, Colony Granite Wash, Eagle Ford, and Permian.
>
> The demand by E&P operators[2] for our high quality, high conductivity ceramic proppant continues to grow, as evidenced by the company's record ceramic proppant sales volume for the quarter. The benefit E&P

---

[2] Understood by its investors to refer to exploration and production companies.

4

> operators see, as measured by increased production and higher estimated ultimate recovery (EURs), continues to enhance their economic returns. We continue to work with our clients to optimize their fracs and maximize their profit through Economic Conductivity® analysis. Regarding our commitment to capacity growth, we were excited to commence production ahead of schedule at the company's newest 250 million lb. production line at our Toomsboro, Georgia plant.

Compl. ¶ 55. Mr. Kolstad also wrote that:

> We exited the third quarter with positive momentum. As a result, we expect proppant sales volumes to remain healthy, tempered by typical fourth quarter seasonality. Although broader economic issues remain fluid and commodity prices continue to fluctuate, we remain optimistic with respect to proppant demand in 2012. Noteworthy is the continued migration of North American upstream investment toward liquid-rich resource plays, where multi-phase flow reservoir conditions benefit the most from CARBO's high conductivity ceramic proppant.

Id.

Also on October 27, 2011, after the press release was issued, Carbo held a conference call with analysts and investors to discuss its earnings and operations. During that conference call, Mr. Kolstad stated:

> Before I move on to discuss our growth in resin-coated sand, I would like to briefly discuss the topic of increasing proppant demand and competition. We have always faced competition, whether from ceramic, resin-coated sand, or sand itself. We have said repeatedly over the years that competition would increase, and thus have

> based our business strategy under this assumption. Demand for proppant continues to grow, further amplified by the large liquids-rich resource plays, such as the Bakken, the Eagle Ford, the Permian, the Granite Wash, which continue to see rising rig counts largely focused on horizontal drilling. The trend toward horizontal drilling continues to increase the amount of proppant consumed, in these long laterals, and have a higher number of frac stages. As I mentioned before, a horizontal well typically consumes 10 times that of a vertical well in proppant.

Compl. ¶ 57. Mr Kolstad also stated that:

> Thanks everybody, for joining us this morning. It was a great quarter for us. Line 4 is starting up. We are going to continue to try and meet the additional demand for our high quality, high conductivity ceramic proppants in these incredible liquid-rich plays. We are going to continue to work on furthering capacity additions, with the 300 million pounds of resin-coating at New Iberia 2, online at the end of the fourth quarter; additional 600 million pounds of resin-coated sand capacity before the end of 2012, in Marshfield, Wisconsin; and up to 400 pounds of ceramic in Milan, Georgia, before the end of 2013.
>
> For the fourth quarter, as we mentioned, we expect proppant sales volumes to remain healthy, tempered by typical fourth-quarter seasonality. Our strategy remains steadfast. We will continue to expand our Company in a competitive marketplace and, doing so, will continue to grow capacity of high quality, high conductivity proppant, leverage and expand our distribution model, and deliver upon the promises we made to our clients.

Compl. ¶ 61.

The following exchanges also occurred during the October 27, 2011 conference call:

> JEFF TILLERY: In the fourth quarter, the history on seasonal impact is mixed. Do you have visibility that we are going to see as seasonal impact? Or is it just a cautionary note that next time we get weather issues early in Winter, just to be aware of it?
>
> GARY KOLSTAD: Well, we have history, I always say it every year, and you guys, maybe 50% of the time, believe me. But, December is always the low month of the year for us, so we always like to put in that comment. I think, other than that, it'll be fine. I think the industry itself – it's interesting, I think – is facing some logistical challenges, and that has to do with the growths in some of the big plays, and the big shift out of the Haynesville into some of the new growth places. I think the entire industry will have to work through some of those issues from a logistical standpoint.
>
> . . . .
>
> JOHN DANIEL: Industry, having logistical issues – you said earlier in the conference call. Was that a reference to include you guys, or does that apply just to the competition?
>
> GARY KOLSTAD: Well, given our strong distribution, and the way we look forward, if things happen, we tend to catch cold, while the rest of them get pneumonia. But the big shift – there has been quite a shift out of the Haynesville, going to the other places, and there is an increasing demand for our product and we assume others. We know the questions that E&P ask us, and service companies ask us. So we have a

> pretty broad audience that we get to listen to, and that is why I made that statement.
>
> JOHN DANIEL: I'm just wondering if the logistical issues facing some of the others might be one reason that the seasonal impact and your ability to deliver product, maybe that seasonal impact in Q4 is not as great.
>
> GARY KOLSTAD: No, we will always have seasonal impacts, and then this thing has gotten so big, and the involvement of railroads, and the involvement of trucking, and the involvement of weather. I get a big kick out of - this year, everybody said, we had weather problems in the Bakken; and we said, well, we have got news for you, you're going to have weather problems in the Bakken every year. It is where we are moving the drilling rigs now, that will pose more of a logistical problem in the North.

Vicens Decl. Ex. C at 4, 16-17.

In response to Carbo's positive public statements, demand for Carbo's stock grew in late 2011, and its price increased from $123.62 per share to $144.18 per share, with the price of Carbo options correspondingly affected.

On January 26, 2012, Carbo issued a press release disclosing that, for the first time in eight quarters, it had failed to sell its proppant above capacity. In a subsequent conference call, defendants disclosed that Carbo had seen a 70% decline in sales in natural gas areas, and had experienced logistical problems transporting and distributing its product to liquid-rich areas.

8

The price of Carbo's shares subsequently declined, to $97.25-$104 per share in January 2012, with the price of Carbo options correspondingly affected.

Plaintiffs allege that the defendants' public statements (quoted above) were materially false or misleading in violation of section 10(b) of the Exchange Act and Rule 10b-5.

## Legal Standard

"When reviewing a motion to dismiss, a court must accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally." Rescuecom Corp. v. Google Inc., 562 F.3d 123, 127 (2d Cir. 2009) (internal quotation marks omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009), quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). Allegations of fraud must be dismissed if plaintiff does not "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b).

## Discussion

Plaintiffs do not allege that defendants' statements were false, and argue only that they were misleading because:

> 56. The statements . . . regarding growing demand for Carbo's proppants and the benefit of "CARBO's high conductivity ceramic proppant" in areas such as the Bakken, Eagle Ford, Granite Wash and the Permian were misleading because Carbo was unable to meet the demand because they were having difficulties delivering the proppants to customers in oil and liquid rich basins where drilling activity was accelerating, which would have a negative affect [sic] on the Company's fourth quarter proppant sales volume and earnings. . . .
>
> . . . .
>
> 58. The statements . . . distinguishing Carbo from its competitors were misleading because they implied that Carbo was able to successfully and quickly deliver proppants to its customers when, in fact, the Company was experiencing severe logistical problems that hindered their ability to transport proppants to liquid rich plays.
> . . . .
>
> 60. The statements . . . that Carbo had a "strong distribution" network and were immune from the logistical issues that "the rest" of the industry was experiencing were materially false and misleading because at the time they were made, Defendants knew that the Company was already experiencing logistical problems as a result of the shift to oil and liquid plays. Rather than disclose these logistical problems, which were already strong, Defendants misleadingly implied that the "shift out of the Haynesville" provided Carbo with an

> opportunity for increased revenue and market share.

Defendants argue that the alleged statements were not misleading, because defendants adequately disclosed the logistical issues to investors.

The October 27, 2011 conference call with investors and analysts began with the operator's statement that:

> I would like to remind all participants that during the course of this conference call, the Company will make statements that provide information other than historical information, and will include projections concerning the Company's future prospects, revenues, expenses, or profits. These statements are considered forward-looking statements, under the Safe Harbor provision of the Private Securities Litigation Reform Act of 1995, and are subject to risks and uncertainties that could cause actual results to differ materially from those projections. These statements reflect the Company's beliefs, based on current conditions, but are subject to risks and uncertainties that are detailed in the Company's press release and public filings.

Vicens Decl. Ex. C at 1.

Mr. Kolstad then proceeded to disclose a number of such risks and uncertainties. During the conference call, Mr. Kolstad made sporadic but repeated remarks regarding the logistical issues facing Carbo:

> I think the industry itself – it's interesting, I think – is facing some logistical challenges, and that has to do with the growths in some of the big plays,

11

> and the big shift out of the Haynesville into some of the new growth places. I think the entire industry will have to work through some of those issues from a logistical standpoint.
>
> . . . .
>
> No, we will always have seasonal impacts, and then this thing has gotten so big, and the involvement of railroads, and the involvement of trucking, and the involvement of weather. . . . It is where we are moving the drilling rigs now, that will pose more of a logistical problem in the North.
>
> . . . .
>
> We are going to continue to try and meet the additional demand for our high quality, high conductivity ceramic proppants in these incredible liquid-rich plays. . . . We will continue to . . . expand our distribution model, and deliver upon the promises we made to our clients.

Id. at 4, 16-19.

Although Mr. Kolstad's disclosures were contained in responses that also pertained to other matters, they were sufficiently clear and provocative that Mr. Daniel, an analyst listening to the conference call, questioned Mr. Kolstad, asking, "Industry, having logistical issues – you said earlier in the conference call . . . . I'm just wondering if the logistical issues facing some of the others might be one reason that the seasonal impact and your ability to deliver product, maybe that seasonal impact in Q4 is not as great," Vicens Decl.

Ex. C at 16-17. It was in response to Mr. Daniel's questioning that Mr. Kolstad clarified that the logistical problems facing Carbo's shift to important liquid-rich markets were connected to "railroads" and "moving the drilling rigs." A reasonable investor listening to the entirety of the conference call was also notified that Carbo's efforts to "try and meet the additional demand" were related to its "distribution model."

"The Court must dismiss a complaint founded on allegations of securities fraud if the allegedly omitted or misrepresented information was in fact appropriately disclosed." White v. Melton, 757 F.Supp. 267, 272 (S.D.N.Y. 1991). Here, Carbo sufficiently disclosed the existence and nature of a logistical problem stemming from its shift to new and financially important markets. A reasonable investor was put on notice that Carbo's attempt to meet the demand for its product faced logistical and delivery obstacles.

Accordingly, defendants' motion is granted.

### Leave to Replead

Plaintiffs request leave to replead if any of their claims are dismissed.

Leave to amend "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). However, "valid reasons for

denying leave to amend include undue delay, bad faith, or futility of the amendment." Mackensworth v. S.S. American Merchant, 28 F.3d 246, 251 (2d Cir. 1994) (citations omitted).

In light of my holding that Carbo sufficiently disclosed the allegedly adverse information, it is unclear whether a second amended complaint would be useful or futile. Plaintiffs may move for leave to serve a second amended complaint, attaching their proposed second amended complaint to the motion.

## Conclusion

Defendants' motion to dismiss the consolidated amended complaint (Dkt. No. 23) is granted; plaintiffs may move for leave to replead upon specific proposed pleading.

So ordered.

Dated: New York, New York
       June 26, 2013

*Louis L. Stanton*
LOUIS L. STANTON
U.S.D.J.